**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**PADUCAH DIVISION**
**CIVIL ACTION NO. 5:20-CV-071-TBR**


THERESSA JOHNSON,                                                    PLAINTIFF


v.


PENNYRILE ALLIED COMMUNITY
SERVICES, et al.                                                          DEFENDANTS


<u>**MEMORANDUM OPINION & ORDER**</u>

This matter is before the Court on the Motion for Summary Judgment filed by

Defendants Roy Brunner and Pennryile Allied Community Services ("PACS"), [DN 40].

Plaintiff Theressa Johnson has filed a response, [DN 48], and Defendants have replied, [DN 55].

This matter is therefore fully briefed and ripe for review. For the reasons set forth below, the

Court will grant Defendants' Motion for Summary Judgment, [DN 40].

## I.    BACKGROUND

Plaintiff,[1] an African American female over the age of forty, alleges that she suffered race

and age discrimination while employed by Defendant Pennyrile Allied Community Services

("PACS") and that she was ultimately wrongfully terminated. [DN 1]. Plaintiff began her

employment at PACS in 2019 when she was hired as an in-home specialist (i.e., social worker).

---
[1] Plaintiff Theressa Johnson initially filed suit with Plaintiff Deborah Johnson. *See* [DN 1]. However, Deborah Johnson has since been dismissed by agreed order. *See* [DN 34; DN 35].

[DN 36, p. 8]. In 2018, she was promoted to the position of Supervisor of the Diversion Division of the Family Preservation Program. *See, e.g.*, [DN 48-2; DN 48-3].

In late 2018/early 2019, PACS promoted Stephanie P'pool to the new position of Operational Director of the Family Preservation Program. *See, e.g.*, [DN 36, pp. 19–20]. Soon after, in February 2019, Charity Roberts, a DCBS employee who served as liaison to PACS, attended a "team meeting" at PACS. *Id.* at 20–21. During the meeting, Roberts asked Plaintiff for her phone number. *Id.* at 21. She then called Plaintiff to discuss P'pool's promotion, and also discussed the matter separately with three other employees, including Cooley-Parker. *Id.* at 21–22. Plaintiff testified that she had not been told "anything about [the position]" until she spoke with Roberts, who asked Plaintiff, "Was the position posted?" and "Had the position been offered to [Plaintiff]?" *Id.* at 21. Plaintiff answered "no" to those questions. *Id.* Roberts told Plaintiff that "it wasn't approved by her and it didn't come by her," *id.*, though the Executive Director of PACS, Harold Monroe, has since testified that Roberts did approve P'pool's promotion. [DN 51, pp. 53–54]. P'pool was ultimately removed from the position of Operational Director in late March 2019, when it was discovered that she was not qualified for the position. *Id.* at 23.

Meanwhile, on March 7, 2019, an employee with the Department for Community Based Services ("DCBS"), which refers cases to PACS, sent a letter to Johnson's supervisor, Sheila Cooley-Parker. [DN 40-4]. In the letter, the employee outlined several concerns with Plaintiff, namely,

> an inability or unwillingness to work with families that DCBS has referred Diversion to, prior biases concerning families that [Plaintiff's] services are referred to, not being able to meet the families where they are and having preconceived notions of what the family is willing to do and not willing to do, and being more concerned with her numbers than providing services for families that she is referred to.

2

*Id.* The DCBS employee (Jessica Hull) went on to state her concerns about Plaintiff's

"willingness and ability to provide services for the families that Child Protective Services works

with on a daily basis as well as the willingness to work with DCBS workers." *Id.*

Another DCBS employee (Nicol Calhoun) wrote to Cooley-Parker on March 11, 2019,

describing similar issues. That employee

> [got] the feeling that Ms. Johnson does not want to work the cases that I have
> referred and will often upon the first meeting with the family call me back with
> several excuses as to why she does not think this is the appropriate program or will
> close the case stating the family is just not willing to work.

[DN 40-5]. She further explained that, due to her bad experiences with Plaintiff, she "often

avoid[]s making referrals to the diversion program" in an attempt "to avoid having to interact

with Ms. Johnson." *Id.*

Due to these concerns, Cooley-Parker met with PACS Human Resources Director Lauren

Wilson, PACS Executive Director Harold Monroe, Brunner, and Roberts. *See* [DN 40-6]. In a

follow-up email dated March 18, 2019, Roberts stated that,

> [a]s for the complaint against [Plaintiff], . . . [i]t appears that there needs to be some
> reeducation on the program goals, referral criteria and eligibility and repairing the
> DCBS/program relationship. . . . This particular complaint has impacted service
> delivery and data in the region and needs to be addressed and resolved as quickly
> as possible.

*Id.*

Meanwhile, PACS was made aware of internal issues regarding Plaintiff's treatment of

the PACS employees that she supervised. Those concerns are outlined in several memoranda

attached to the Defendants' Motion for Summary Judgment. *See* [DN 40-7; DN 40-8; DN 40-9].

In those memoranda, various employees reported that Plaintiff was "unwilling to work the

cases," [DN 40-7], and they felt like they "really have to watch our backs because of her

3

(Theressa Johnson)," [DN 40-8, p. 3]. Another employee stated that Plaintiff's Diversion Division often found "ways to not work a case or close a case early," and also felt that "the communication was 'not good and that many times we do not know the reason why a case is closed or assessment only.'" *Id.* at 4. Yet another employee "felt at times that Ms. Johnson was looking for ways to close the Diversion cases instead of working them." [DN 40-9]. One of Plaintiff's subordinates also stated that "she was glad that her supervisor [Plaintiff] was on vacation because 'it gives me a break.'" [DN 40-8, p. 2].

Plaintiff was terminated on March 26, 2019. [DN 40-10]. Her termination letter, signed by Cooley-Parker, explained that PACS had received information from DCBS that Plaintiff had been quick to close a case and unwilling to work with the family, which then prompted an investigation by PACS. *Id.* The letter explained that DCBS's working relationship with Plaintiff "has been strained and unproductive for a number of years," citing Plaintiff's unwillingness to work with the families and propensity for "closing cases early with very little effort." *Id.* As a result, it explained, DCBS refused to refer cases to Diversion, which put the program "at great risk of losing funding." *Id.* "In addition," the letter continued, "interviews with internal staff indicate problematic behavior including passive aggressive tendencies that have created negative undercurrents in the working environment." *Id.* The letter notified Plaintiff that her employment with PACS was terminated, effective immediately. *Id.*

Sometime after Plaintiff's termination, Wilson (the Human Resources Director), spoke to Roberts (the DCBS liaison), who told Wilson that she believed Plaintiff's problems could have been remedied with a performance improvement plan, rather than termination. [DN 50, p. 50]. Wilson agreed that a performance improvement plan was the appropriate remedy. *Id.* As a result, PACS made an offer of reinstatement to Plaintiff, which she accepted. [DN 36-1]. On or about

April 9, 2019, Plaintiff returned to work at PACS with no loss of pay and no loss of benefits. *Id.*; *see also* [DN 36, p. 34].

That same day, Plaintiff met with Cooley-Parker, Brunner, and Wilson. [DN 36, p. 34–35]. In her deposition testimony, Plaintiff was unable to recall the exact details of the meeting but acknowledged that "they may have talked to [her] about [her] interaction with [her] staff." *Id.* at 35. In a Memorandum memorializing the meeting, Wilson wrote that she, Brunner, and Cooley-Parker "had an extensive conversation with [Plaintiff] about the reason that led to her separation from employment on March 28th." [DN 40-12]. According to the memo, the bulk of the conversation "revolved around [Plaintiff's] interaction with staff and other teammates." *Id.* Plaintiff was advised that her staff saw her as intimidating and dismissive, and moving forward, her "approach with [young social workers] needed to be that of a teacher." *Id.* Plaintiff agreed, "but was in disagreement that she was intimidating and unapproachable." *Id.* Plaintiff eventually asked for a "fresh start" at PACS, was advised that this was "what we all want," and assured Wilson, Brunner, and Cooley-Parker that "she would take the steps necessary to retain her employment with PACS." *Id.*

This memo is dated April 9, 2019, the date of Plaintiff's reinstatement and the date of the meeting. *Id.* In her deposition, Wilson testified that she wrote the memo that same day to memorialize the meeting.  [DN 50, p. 63]. However, after the deposition, she reviewed the computer data and realized she had drafted the document on August 19, 2019. [DN 40-13]. She immediately contacted defense counsel and then explained the date issue in an affidavit. *Id.*

Shortly after Plaintiff's reinstatement, in or around June 2019, Cooley-Parker resigned and was replaced by Christine Bustamante. [DN 52, p. 30] To "get a feel of where the staff was," Bustamante sent out a survey to all of the employees in her department. *Id.* at 37. When the

surveys were completed and returned, Bustamante discovered that many employees still held serious concerns about Plaintiff's management style. *See* [DN 40-14].

Additionally, at least one of Plaintiff's subordinates requested a transfer to a different department, citing an inability to work for Plaintiff. [DN 40-15; DN 40-16; DN 40-17]. Then, on August 15, 2019, Plaintiff attended an informal counseling session with Wilson to discuss the results of the surveys. [DN 40-18]. In a Memorandum memorializing the meeting, Wilson noted that she discussed Plaintiff's communication and supervisory style, and also noted that Plaintiff "again appeared focused on vindication and 'winning' in the situation" when discussing her subordinate's requested transfer. *Id.* Ultimately, Wilson "left with a sense of [Plaintiff] being very defensive," and she noted that she was "unsure if [Plaintiff] is hearing my concerns in a manner that will effect change." *Id.*

On August 18, 2019, Bustamante recommended that Plaintiff be terminated. [DN 40-19]. In a Memorandum explaining her recommendation, Bustamante explained, "The workplace [of the Diversion program] is unhealthy, unstable, and toxic," and "[w]ithout immediate and decisive action, I am worried that the safety of staff and clients will continue to be at risk, funding sources will continue to refuse to make referrals, and ultimately the entire contract may be placed in jeopardy." *Id.* Wilson then issued a termination letter to Plaintiff on August 19, 2019. [DN 40-20]. He explained that the employee satisfaction survey results were "troubling," and cited to the transfer that one of Plaintiff's subordinates had requested, as well as Plaintiff's efforts to "confront" that employee despite having been instructed not to do so. *Id.* He concluded by explaining, "Your attitude towards your staff and teammates, and your unwillingness to address your negative behavior have led to our decision to terminate your employment effective today, August 19, 2019." A vacancy notice was posted, and Kayla Powell, a social worker in a

similar PACS program, expressed interest. [DN 52, pp. 64–65]. Powell was the only person who applied for the vacancy, and she was ultimately promoted to the position. *Id.* at 65–69.

On January 21, 2020, Plaintiff field a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), [DN 40-2]. In her letter to the EEOC, Plaintiff requested a right to sue letter and advised that she "would like to pursue legal remedies available." *Id.* at 4. It does not appear that the EEOC investigated Plaintiff's allegations; rather, the EEOC issued a Notice of Right to Sue Letter on January 29, 2020, per Plaintiff's request. [DN 40-3].

Plaintiff then filed this suit on April 27, 2020, [DN 1]. She names as defendants PACS, the Cabinet for Health and Family Services ("CHFS"); Roy Brunner (the Assistant Director of PACS) and "Does 1–50." *Id.* She asserts the following causes of action: discrimination, harassment (hostile work environment), retaliation, and wrongful termination in violation of 42 U.S.C. § 1981 (Count 1); racial discrimination under KRS 344.050[2] (Count 2); age discrimination under KRS 344.050 (Count 3); retaliation under KRS 344.050 (Count 4); wage discrimination under KRS 344.100 (Count 5); negligent infliction of emotional distress (Count 6); intentional infliction of emotional distress (Count 7); negligent hiring, retention, and supervision (Count 8); wrongful termination (Count 9); retaliation in violation of Kentucky's Whistleblower Act, KRS 61.102 (Count 10); and discrimination under Title VII (Count 11).

Specifically, Plaintiff alleges that PACS "refused to allow [her] to apply for the Operational Director position vacated by" P'pool, and PACS terminated her in retaliation for her involvement in the investigation of P'pool's promotion. [DN 1, p. 7]. She also alleges age and race discrimination based on her replacement by Kayla Powell, a white female in her mid-to-late

---

[2] The Kentucky Civil Rights Act ("KCRA") is encompassed within Chapter 344 of the Kentucky Revised Statutes.

twenties, and states that she "was terminated twice because of her race." *Id.* at 8, 13, 15. She further alleges that she was treated differently because of her age and race and was subjected to "harassing conduct." *Id.* at 13, 15. She also alleges that she was compensated at a lower rate than her younger white counterparts. *Id.* at 17. She alleges that Defendants "subjected Plaintiff[] and (sic) to racial harassment, age harassment, racial discrimination, age discrimination and racially hostile work environment, culminating in and end to their employment relationship with PACS," and PACS "failed to investigate and prevent incidents or racial harassment and age harassment despite being on notice of the pattern and practice of racial and age discrimination." *Id.* at 12. Among other things, she alleges that Defendants "negligently hired, retained and/or failed to adequately supervise" employees who engaged in "unlawful racially harassing and age harassing a (sic) conduct." *Id.* at 21.

Defendants now seek summary judgment. [DN 40]. The matter is fully briefed and ripe for review. [DN 48; DN 55].

## II.    LEGAL STANDARD

To grant a motion for summary judgment, the Court must find that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

In reviewing a motion for summary judgment, the Court must review the evidence in the light most favorable to the non-moving party; however, the non-moving party must do more than merely show that there is some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the non-moving party must present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

Ultimately, if the record, taken as a whole, could not lead the trier of fact to find for the nonmoving party, then there is no genuine issue of material fact and summary judgment is appropriate. *Matsushita Elec.*, 475 U.S. at 587 (citation omitted).

## III.   ANALYSIS

### A.  Citations to the Record

As an initial matter, the Court must address Defendants' objection to Plaintiff's repeated failure to cite to the record when stating facts in her response brief. In their reply brief, Defendants "object to all uncited 'facts' identified in Johnson's Statement of Facts and supporting arguments and assert that the same is not to be considered for purposes of this Motion for Summary Judgment." [Dn 55, p. 2]. For support, Defendants cite to Federal Rule of Civil Procedure 56(c). That rule provides that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by" either "citing to particular parts of materials in the record" (e.g., depositions or affidavits) or "showing that the materials cited do not establish the

absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)–(B). Importantly, the rule further provides that "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). In other words, the Court is under no obligation to search the record to determine if a genuine dispute of material fact exists; rather, the burden rests on the parties to identify those portions of the record that support their claims. *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001) (explaining that the Court is not obligated to "search the entire record to establish that it is bereft of a genuine issue of material fact").

In this case, Plaintiff repeatedly makes statements of fact in her response brief, but often fails to cite to any evidence in the record to support those assertions. When reviewing these unsupported facts, the Court is mindful of Plaintiff's burden as the responding party to identify "particular parts of materials in the record" to support her position. *See* Fed. R. Civ. P. 56(c)(1)(A). Where a statement of "fact" made by either party is unsupported by a citation to the record, the Court will disregard that "fact" unless the Court is able to determine that it is clearly supported by the record. However, as noted above, the Court is not obligated to search the entire record to do so. To the extent necessary, the Court addresses some of these proposed "facts" below.

**B. Credibility Issues**

The Court next addresses Plaintiff's arguments that "all of Defendants' witnesses lack credibility" [DN 48, p. 1]; *see also id.* at 14–17. Despite this statement, Plaintiff's brief addresses the testimony of only two witnesses: Cooley-Parker (Plaintiff's supervisor) and Wilson (the Human Resources Director). *Id.* at 14–17. With respect to Cooley-Parker, Plaintiff argues that there are "serious concerns with [her] credibility" because other witnesses "testified that during

private discussions leading up to the termination, [Cooley-Parker] lied or misrepresented facts about [Plaintiff] to Wilson, Brunner, and Monroe." *Id.* at 14. Specifically, she points to the testimony of Brunner and Monroe. *Id.* at 15–16; *see also* [DN 51; DN 53].

 With respect to Wilson, Plaintiff argues that "[t]here are also concerns with [her] credibility" because "Wilson knowingly proceeded with the termination of [Plaintiff] on March 26, 2019, although she knew there was insufficient evidence and knew there was not a legitimate business concern." [DN 48, p. 16]. Plaintiff also points to Wilson's testimony that she drafted a memo for Plaintiff's personnel file on April 9, 2019, to memorialize her meeting with Plaintiff on that same day; however, as previously noted, Wilson clarified (by affidavit) that the memo was drafted on August 19, 2019. *Id.* at 16–17; *see also* [DN 50, p. 63; DN 40-13].

The Court finds Plaintiff's arguments to be unavailing. It is true that "[c]ourts may not resolve credibility disputes on summary judgment." *Dawson v. Dorman*, 528 F. App'x 450, 452 (6th Cir. 2013) (citation omitted). However, "[t]his rule of procedure typically applies where there is a *genuine* conflict in the evidence, with affirmative support on both sides and where the question is which witness to believe." *Id.* (citation omitted). Further, the party questioning a witness's credibility must offer specific facts to support that claim. *Id.* (citations omitted); *see also Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) ("[W]hen challenges to witness[ ] credibility are *all* that a plaintiff relies on, and he has shown no independent facts—no proof—to support his claims, summary judgment in favor of the defendant is proper."). Stated another way, "[t]he 'prospect of challenging a witness'[s] credibility is not alone enough to avoid summary judgment.'" *Dawson*, 528 F. App'x at 452 (quoting *Dugan v. Smerwick Sewerage Co.*, 142 F.3d 398, 406 (7th Cir. 1998)). And, even where the opposing party provides specific facts to challenge the witness's credibility, summary judgment may still be appropriate if that witness's

11

testimony is not critical. *Id.* at 453. For example, if the witness's testimony is relevant to only one element of the plaintiff's claim, summary judgment might still be appropriate if there is no genuine dispute of material fact with respect to the other elements of that claim. *See id.* (noting in a malicious prosecution case that the witness's credibility issue "was not critical to the determination of probable cause and did not influence the prosecutor's decision to proceed," and summary judgment was appropriate where those two essential elements could not be proven).

This case is not one in which there exists "a *genuine* conflict in the evidence, with affirmative support on both sides and where the question is which witness to believe." *Dawson*, 528 F. App'x at 452 (citation omitted). Rather, there is other evidence in the record, independent of the testimony of Cooley-Parker and Wilson, from which the Court may make its ruling. In doing so, the Court does not weigh the credibility of these or other witnesses; rather, the Court has reviewed the evidence of record and determined that no genuine dispute of material fact exists with respect to certain essential elements of Plaintiff's claims, as outlined below.

### C.  Hearsay Issues

Plaintiff also argues that "Defendants have failed to submit any admissible evidence." [DN 48, p. 1]; *see also id.* at 17–30. She specifically objects to the following exhibits: the March 7, 2019 letter from a DCBS employee (Jessica Hull) outlining her concerns about Plaintiff, [DN 40-4]; the March 11, 2019 letter from a DCBS employee (Nicol Calhoun) outlining her concerns about Plaintiff, [DN 40-5]; the March 18, 2019 email from Roberts to Cooley-Parker, Brunner, and Monroe, [DN 40-6]; the March 12, 2019 Memorandum by Cooley-Parker summarizing a conversation with other employees about their ongoing difficulties with Plaintiff, [DN 40-7]; a series of three Memoranda by Cooley-Parker, each dated March 21, 2019, summarizing conversations with other employees about their interactions with Plaintiff, [DN 40-8]; the March

22, 2019 Memorandum by Cooley-Parker summarizing a conversation with another employee about her work with Plaintiff, [DN 40-9]; Plaintiff's March 26, 2019 Termination Letter, [DN 40-10]; the April 9, 2019 Memorandum regarding a meeting held with Plaintiff upon her reinstatement [DN 40-12]; the results of the survey, [DN 40-14]; the August 1, 2019 transfer request by one of Plaintiff's subordinates, [DN 40-15]; the July 26, 2019 Memorandum and August 1, 2019 Memorandum regarding a subordinate's desire to quit due to Plaintiff's behavior, [DN 40-16; DN 40-17]; an August 15, 2019 Memorandum describing a meeting between Bustamante and Plaintiff, [DN 40-18]; and the August 18, 2019 Memorandum from Bustamante, recommending Plaintiff's termination, [DN 401-9]. Plaintiff objects to each of these exhibits, arguing that each is hearsay. [DN 48, pp. 17–30].

The Court disagrees. Federal Rule of Civil Procedure 56 allows a party to object to summary judgment on the basis "that the material cited to support or dispute a fact cannot be presented in a form that would be admissible as evidence." Fed. R. Civ P. 56(c)(2). Generally speaking, then, "hearsay evidence may not be considered on summary judgment." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 927 (6th Cir. 1999). However, in this case, the proffered out-of-court statements are not offered for the truth of the matter asserted, and they are therefore not hearsay. Fed. R. Evid. 801(c) (defining hearsay). These documents include statements regarding Plaintiff's behavior and management style. However, Defendants do not offer these documents to prove that Plaintiff actually misbehaved or acted a certain way during her employment with PACS. Rather, these documents are offered to prove why the PACS administration terminated Plaintiff—i.e., because they received multiple complaints about her behavior in the workplace. Because they are not offered for the truth of the matter asserted, they are not hearsay.

Further, the Court believes that Plaintiff has misapprehended the requirements of Rule 56. As the Sixth Circuit has explained, the rule "requires a [party's] evidence to be admissible only as to its contents and not as to its form, as long as the plaintiff can proffer that it will be produced in an admissible form." *Wyatt v. Nissan North America, Inc.*, 999 F.3d 400, 423 (6th Cir. 2021) (citation omitted). Thus, where the out-of-court declarant may testify at trial regarding the contents of the alleged hearsay, the hearsay issue is often resolved. *Id.* at 423–24 (citations omitted); *see also Americredit Financial Services, Inc. v. Lyons*, No. 3:19-cv-01045, 2022 WL 135420, at *8 (M.D. Tenn. Jan. 13, 2022) (citations omitted). In this case, to the extent any of the above-cited exhibits contain hearsay, the out-of-court declarants can simply testify at trial, as evidenced by the deposition testimony in the record. Accordingly, for these reasons, the Court will not strike or disregard any of the above-cited exhibits on the basis of hearsay.

### D.  Claims Against Defendant Brunner

Plaintiff's claims for racial discrimination under KRS 344.050 (Count 2); age discrimination under KRS 344.050 (Count 3); retaliation under KRS 344.050 (Count 4); wage discrimination under KRS 344.100 (Count 5); wrongful termination in violation of public policy (Count 9); retaliation in violation of Kentucky's Whistleblower Act, KRS 61.102 (Count 10); and discrimination under Title VII (Count 11) must be brought against the plaintiff's *employer*. *See Temple v. Pflugner*, 866 F. Supp. 2d 735, 744 (E.D. Ky. 2011) (quoting *Lorson v. Wal-Mart Stores, Inc.*, No. Civ.A. 5:05CV-50-R, 2005 WL 1287421 (W.D. Ky. 2005)). *Wathen v. General Elec. Co.*, 115 F.3d 400, 404 (6th Cir. 1997); *Watson v. Hargens*, No. 3:17-cv-532-DJH-CHL, 2020 WL 2812562, *3 (W.D. Ky. May 29, 2020).  Plaintiff cannot utilize these causes of action to impose individual civil liability on an individual employee/supervisor. Accordingly, to the

extent Plaintiff seeks to impose such individual liability against Defendant Brunner,[3] those

claims must be dismissed. The Court will therefore grant summary judgment in favor of Brunner

on Counts 2, 3, 4, 5, 9, 10, and 11.

For similar reasons, the Court must dismiss Count 1, Plaintiff's 42 U.S.C. § 1981 claim,

to the extent she seeks to bring that claim against Brunner. As the Sixth Circuit has explained, 42

U.S.C. § 1983 is the "exclusive remedy for violations against state actors sued in their official

capacities," and § 1983 is therefore the appropriate remedy to pursue against a state actor

accused of violating § 1981. *McCormick v. Miami University*, 693 F.3d 654, 660 (6th Cir. 2012)

(citing *Grinter v. Knight*, 532 F.3d 567, 577 (6th Cir. 2008)). With respect to state actors being

sued in their *individual* capacities, like Brunner, the Sixth Circuit has similarly stated that

"§ 1983 is the exclusive mechanism to vindicate violations of § 1981 by an individual state actor

acting in his individual capacity." *Id.* at 661; *see also Qui v. University of Cincinnati*, 803 F.

App'x 831, 839 (6th Cir. 2020).

Nevertheless, Plaintiff argues that an individual actor may be held liable under § 1981

when that individual has supervisory capacity and was personally involved in the alleged

misconduct. [DN 48, p. 31]. However, each of the cases cited by Plaintiff precedes the

*McCormick* case cited above, in which the Sixth Circuit expressly stated that § 1983 is the

exclusive remedy for § 1981 claims against state actors. *McCormick,* 693 F.3d at 661. In fact, the

district court in *McCormick* discussed one of the cases cited by Plaintiff: *Allen v. Ohio*

*Department of Rehabilitation and Correction*, 128 F. Supp. 2d 482 (S.D. Ohio 2001). *See*

*McCormick v. Miami University*, No. 1:10-cv-345, 2011 WL 1740018, *10 (S.D. Ohio May 5,

---

[3] Plaintiff does not argue that she intended to sue Brunner in his official capacity and instead makes arguments as to why he should be held liable in his individual capacity. *See, e.g.*, [DN 48, pp. 30–32].  The Court therefore understands that Plaintiff sues Defendant Brunner in his individual capacity.

2011). That court noted that, in *Allen*, the district court had "assumed that it was possible to bring a § 1981 claim against a state actor in his individual capacity," but it did not engage in an analysis of whether the plaintiff should have pursued that claim under § 1983.[4] *Id.* As a result, that court did not address several cases from within the Sixth Circuit that "have expressly determined that such claims are not cognizable" under Supreme Court precedent. *Id.* (citations omitted). The court in *McCormick*, however, *did* undertake that analysis and determined § 1983 is the proper remedial scheme for claims alleging violations of § 1981 against state actors.[5] *Id.* The Sixth Circuit affirmed the district court's analysis. *McCormick*, 693 F.3d at 661. In doing so, it stated, "we conclude that § 1983 is the exclusive mechanism to vindicate violations of § 1981 by an individual state actor acting in his individual capacity." *Id.*

Here, Plaintiff attempts to impose civil liability under § 1981 against Defendant Brunner for actions that he allegedly took while acting as a *state employee*.[6] The appropriate remedy for such violations is through a § 1983 claim. Accordingly, to the extent Plaintiff seeks to impose liability against Defendant Brunner through § 1981, the Court must dismiss that claim (Count 1) and grant summary judgment in favor of Brunner.

Plaintiff's remaining claims against Brunner are: negligent infliction of emotional distress (Count 6); intentional infliction of emotional distress (Count 7); and negligent hiring, retention,

---

[4] The other cases cited by Plaintiff also failed to engage in an analysis of whether the plaintiffs should have pursued their claims under § 1983. *See Williams v. United Dairy Farmers*, 20 F. Supp. 2d 1193 (S.D. Ohio 1998); *Grimes v. Superior Home Health Care of Middle Tenn., Inc.*, 929 F. Supp. 1088 (M.D. Tenn. 1996); *Williams v. Morgan Stanley & Co., Inc.*, No. 08-12435, 2009 WL 7991621 (E.D. Mich. Mar. 24, 2009).

[5] The district court acknowledged that "there may be cases in which a plaintiff seeks to hold a state employee liable for alleged violations of § 1981 that are completely attenuated from the defendant's status as a state employee, such as where the alleged violations occurred in the context of the defendant's private side-business." 2011 WL 1740018, at *10. The Sixth Circuit agreed. 693 F.3d at 661 n.3. However, in both *McCormick* and the present case, the plaintiffs "attempt[ed] to hold state employees liable for actions taken in the context of and under authority derived from their state employment." 2011 WL 1740018, at *10. As a result, § 1983 was the proper remedy. *See, e.g.*, *id.*

[6] The parties do not dispute that PACS is a state actor.

and supervision (Count 8). These causes of action are addressed below and, for the reasons

stated, do not survive summary judgment. Further, as explained herein, even if Brunner could be

found individually liable under Counts 1, 2, 3, 4, 5, 10, and 11, those claims also fail.

Accordingly, the Court will grant summary judgment in favor of Defendant Brunner on all

counts.

### E.  Count 1 - Discrimination, Harassment, Retaliation, and Wrongful Termination in Violation of 42 U.S.C. § 1981

#### 1.  Claims Relating to Age Discrimination

Defendants argue that § 1981 cannot form the basis of an age discrimination claim, as it

proscribes discrimination based on race, not age. [DN 40-1, p. 9]. Plaintiff responds to by stating

that "there is no need for an age discrimination claim" under § 1981, because she is pursuing her

age discrimination claims under the KCRA, KRS 344.010, et seq. [DN 48, p. 33]. Accordingly,

the Court understands that Plaintiff is *not* pursuing an age discrimination claim under § 1981.

Instead, Plaintiff brings a race-based discrimination and retaliation claim for her March 2019

termination and her August 2019 termination, and a race-based harassment/hostile workplace

claim for actions that took place after her April 2019 reinstatement. The Court considers each of

these claims in turn.

#### 2.  Retaliation and Discrimination Claims

In her complaint, Plaintiff alleges that both her March 2019 termination and her August

2019 termination were retaliatory in nature and both constituted racial discrimination, thereby

violating § 1981. [DN 48, pp. 33–38]. With respect to the March 2019 termination, Defendants

argue that Plaintiff's claims are untimely, citing a one-year statute of limitations. However, the

Court finds that, pursuant to *Anthony v. BTR Automotive Sealing Systems, Inc.*, 339 F.3d 506 (6th

Cir. 2003) a four-year statute of limitations applies to Plaintiff's § 1981 claims. In *Anthony*, the

Sixth Circuit considered whether the limitations period for § 1981 claims was extended by 28 U.S.C. § 1658—a general four-year statute of limitations applying to all claims enacted after its passage in 1990. *Id.* at 512–14. The Sixth Circuit ultimately concluded that "the four-year statute of limitations set forth in 28 U.S.C. § 1658 does indeed apply to § 1981 claims insofar as they arise under the portion of the statute enacted by the Civil Rights Act of 1991." *Id.* at 514. Prior to the Civil Rights Act of 1991, § 1981 prohibited only discriminatory *hiring* practices; however, the Civil Rights Act amended § 1981 such that it also proscribed discriminatory terminations and other discriminatory actions occurring after the formation of the employment relationship. *Id.* at 512. Thus, in the Sixth Circuit, a plaintiff's claim for discriminatory hiring practices is subject to the forum state's analogous statute of limitations (one year in Kentucky), but discriminatory firing or hostile workplace claims would be subject to the four-year statute of limitations set forth in 28 U.S.C. § 1658. In the present case, Plaintiff claims discriminatory firing and a hostile workplace, and a four-year statute of limitations therefore applies. Her § 1981 claims are therefore timely.

Having determined that these claims are timely, the Court turns to their merits. Section 1981 claims like these "are governed by the same burden-shifting standards as Title VII claims." *Crayton v. Pharmedium Servs., LLC*, 213 F. Supp. 3d 963, 978 (W.D. Tenn. 2016) (citations omitted). Thus, when considering Plaintiff's claims of intentional discrimination or retaliation based on circumstantial evidence, the Court turns to the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Wright v. Murray Guard, Inc.*, 455 F.3d 702, 706 (6th Cir. 2006); *Crayton*, 213 F. Supp. 3d at 978 (citations omitted).

Under the *McDonnell Douglas* framework, Plaintiff must first establish a prima facie case of race discrimination or retaliation. *See, e.g.*, *Wright*, 455 F.3d at 706. If she does so,

"Defendants must then articulate a legitimate, nondiscriminatory reason for their employment decision." *Id.* If Defendants articulate such a reason, "any presumption of discrimination or retaliation drops from the case, and Plaintiff must prove by a preponderance of the evidence that Defendants' stated reason was pretextual." *Id.* at 706–07. Throughout this framework, the burden of production shifts; however, "the ultimate burden of persuading the trier of fact that Defendants intentionally discriminated or retaliated against Plaintiff remains at all times with Plaintiff." *Id.* at 707. The Court applies this framework to Plaintiff's discrimination and retaliation claims in turn.

### a.   Discrimination

The Court first considers whether Plaintiff can meet her burden of demonstrating a prima facie case of racial discrimination. To show a prima facie case of racial discrimination, a plaintiff must show "(1) he or she was a member of a protected class; (2) he or she suffered an adverse employment action; (3) he or she was qualified for the position; and (4) he or she was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees." *Id.*  As the Sixth Circuit has explained, "The key question is always whether, under the particular facts and context of the case at hand, the plaintiff has presented sufficient evidence that he or she suffered an adverse employment action under circumstances which give rise to an inference of unlawful discrimination." *Crayton*, 213 F. Supp. 3d at 979 (quoting *Macy v. Hopkins County Sch. Bd. of Educ.*, 484 F.3d 357, 365 (6th Cir. 2007), *abrogated on other ground by Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 313 (6th Cir. 2012)) (internal quotation marks omitted).

In this case, the parties do not dispute that Plaintiff, as an African American, is a member of a protected class, nor do the parties dispute that she suffered adverse employment actions,

namely, her two terminations, or that she was qualified for that position. However, with respect to her initial March 2019 termination, Plaintiff cannot demonstrate the fourth element of her prima facie case because she was not replaced by someone outside the protected class but was instead reinstated to her former position. Nor has she cited any evidence that she was treated differently with respect to a similarly situated employee. For example, there is no evidence that another supervisor remained employed despite receiving similar complaints. On this point, Plaintiff briefly argues that Kayla Powell, who replaced Plaintiff after her August 2019 termination, "faced some of the same challenges" as Plaintiff but was not disciplined. *See* [DN 48, p. 35]. However, unlike Plaintiff's case, there is no evidence that any complaints were filed against Powell, either by DCBS or Powell's subordinates. Rather, Powell stated in her deposition that DCBS seemed hesitant to make referrals to her division and the Diversion Division had a "poor rapport" with DCBS. [DN 49, 27–28]. In context, this seems to refer to the long-standing poor rapport between that division and DCBS, which allegedly resulted from Plaintiff's management of the division, not Powell's. *See id.* There is no evidence in the record that DCBS made complaints about Powell's willingness to accept and work referrals, as it had with Plaintiff. In fact, Monroe stated in his deposition that DCBS had never made a complaint about Powell specifically. [DN 51, p. 28]. Accordingly, there is no evidence that Plaintiff was treated differently than a similarly situated employee. The Court therefore finds that Plaintiff cannot prove a prima facie case of discrimination, at least with respect to the March 2019 termination.

Further, even assuming Plaintiff can demonstrate a prima facie case of racial discrimination with respect to both terminations, PACS has satisfied its burden of articulating a legitimate and non-discriminatory reason for terminating Plaintiff on both occasions. More specifically, PACS received numerous complaints from DCBS employees and Plaintiff's

subordinates outlining serious problems with her coordination and management of DCBS referrals and her supervisory style. *See, e.g.*, [DN 40, pp. 36–37]; Section I, *supra*. These issues "constitute legitimate, nondiscriminatory reasons for [Plaintiff's] termination because they are reasons, supported by admissible evidence, 'which *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action.'" *Wright*, 455 F.3d at 707 (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507 (1993)).

Because PACS has articulated a legitimate and non-discriminatory reason for the terminations, the burden shifts back to Plaintiff to demonstrate pretext. She may do so "either directly by persuading the [trier of fact] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* (quoting *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1082 (6th Cir. 1994), *overruled on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009)) (internal quotation marks omitted). The Sixth Circuit has identified "three interrelated ways" in which Plaintiff can accomplish this. *Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 (6th Cir. 2009). She can demonstrate "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Id.* (citation omitted). However, at the summary judgment stage, Plaintiff "need only produce enough evidence to support a prima facie case and to rebut, but not to disprove, the defendant's proffered rational." *Id.* (citation omitted). Conversely, if a jury could not reasonably doubt the employer's explanation based on the evidence presented, summary judgment is appropriate. *Id.*

In this case, Plaintiff argues that "[t]here is no doubt that PACS intended to discriminate against [Plaintiff] because although [Plaintiff] did her job well and passed all employment

standards with flying colors she was still singled out, terminated and replaced by a less qualified white woman." [DN 48, p. 37]. She cites to following "facts" as establishing pretext: (1) there was no documentation of her "underperforming," (2) she was reinstated after Roberts advocated for her to be rehired; and (3) an unemployment hearing officer found that "there was insufficient evidence presented [at an unemployment hearing] to establish that claimants' behavior was inappropriate towards subordinates." *Id.* at 37–38.

With respect to the first of these alleged "facts," the record reflects that Plaintiff was terminated on both occasions due to serious concerns about her poor working relationship with DCBS (and her unwillingness to work its referrals) and her supervisory style and attitude, not necessarily because she was "underperforming" as Plaintiff suggests. Additionally, after the March 2019 termination, Roberts acknowledged Plaintiff's problems in the workplace, but felt that they could be remedied with a performance improvement plan. [DN 50, p. 50]. It is unclear why Plaintiff believes this demonstrates pretext, especially after Plaintiff was reinstated to her former position and provided with an opportunity to improve. Lastly, with respect to Plaintiff's unemployment proceedings, the Court notes that evidence of such collateral proceedings would be inadmissible at trial, as it "would not be helpful to the jury and would likely confuse the issues." *Meads v. Lexington-Fayette Urban Cnty Govt.*, No CV 5:13-228-DCR, 2016 WL 4577406, *5 (E.D. Ky. Aug. 31, 2016) (citing Fed. R. Evid. 403). The Court therefore finds that Plaintiff failed to produce admissible evidence to rebut PACS's proffered reasons for her terminations. Stated another way, a jury could not reasonably doubt PAC's explanation based on the evidence presented.

Accordingly, the Court finds that, even if Plaintiff can demonstrate a prima facie case of racial discrimination for her March 2019 and August 2019 terminations, PACS has articulated a

legitimate, non-discriminatory reason for the terminations. The burden then rests on Plaintiff to demonstrate pretext, which she has failed to do. Accordingly, to the extent Plaintiff seeks relief under § 1981 for racial discrimination, the Court will grant summary judgment in favor of Defendants.

### b.    Retaliation

Plaintiff may demonstrate a prima facie case of retaliation by showing that "(1) she engaged in protected activity, (2) the activity was known to the defendant, (3) the plaintiff was subjected to a materially adverse action, and (4) there was a causal connection between the protected activity and the adverse action." *Crayton*, 213 F. Supp. 3d at 981 (citation omitted). As the Court has noted above, the burden then shifts to Defendants to articulate a legitimate, nonretaliatory reason for Plaintiff's terminations. *Harris v. Metropolitan Gov. of Nashville and Davidson Cnty, Tenn.*, 594 F.3d 476, 487 (6th Cir. 2010) (citation omitted). If Defendants can articulate such a reason, Plaintiff must "show that the proffered reason was not [Defendants'] true reason but merely a pretext for retaliation." *Id.* (citation omitted). However, the burden of persuasion remains with Plaintiff through this framework. *Id.*

In this case, the Court finds that Plaintiff has failed to demonstrate a prima facie case of race-based retaliation in violation of § 1981. With respect to the first element, there is no evidence that Plaintiff engaged in a protected activity. She cites to her conversation with Roberts about P'pool and argues that she "specifically commented" that "a white woman had been promoted" to the position of Operational Director. [DN 48, p. 36]. However, there is no evidence that that conversation had anything to do with race (or age). Instead, Plaintiff testified that she had not been told "anything about [the position]" until she spoke with Roberts, who asked Plaintiff, "Was the position posted?" and "Had the position been offered to [Plaintiff]?" *Id.* at 21.

Plaintiff answered "no" to those questions. *Id.* There is no evidence that Plaintiff made any reports about P'pool's promotion that related to race. Plaintiff has therefore failed to establish that she engaged in a protected activity, and as a result, she has failed to establish a prima facie case of retaliation.

Further, even if Plaintiff could prove a prima facie case of retaliation, Defendants have articulated a legitimate, nonretaliatory reason for both terminations, namely, the multiple complaints regarding Plaintiff. *See, e.g.*, Section I, *supra*. The burden then shifts to Plaintiff to demonstrate pretext. As previously explained in the context of her discrimination claims, she may do so by demonstrating "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Chen*, 580 F.3d at 400 (citation omitted). Plaintiff does not address pretext in the context of her § 1981 racial retaliation claim. *See* [DN 48, pp. 36–37]. Instead, she addresses only the elements of a prima facie case of retaliation. *Id.* Plaintiff has therefore failed to satisfy her burden of rebutting Defendants' proffered nonretaliatory reason for her terminations.

Accordingly, the Court finds that, even if Plaintiff can demonstrate a prima facie case of retaliation for her March 2019 and August 2019 terminations, PACS has articulated a legitimate, non-discriminatory reason for the terminations. The burden then rests on Plaintiff to demonstrate pretext, which she has failed to do. Accordingly, to the extent Plaintiff seeks relief under § 1981 for racial retaliation, the Court will grant summary judgment in favor of Defendants.

### 3. Harassment Claim

In her complaint, Plaintiff also alleges that she was harassed in the period after her April 2019 reinstatement and prior to her August 2019 termination, in violation of § 1981. For this

cause of action to survive, each of the following elements must be satisfied: (1) Plaintiff "belonged to a protected group"; (2) Plaintiff "was subject to unwelcome harassment"; (3) "the harassment was based on race"; (4) "the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment," and (5) "the defendant knew or should have known about the harassment and failed to act." *Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011) (citation omitted). As previously noted, the parties do not dispute that Plaintiff, as an African American, belonged to a protected group based on her race. However, Defendants argue that Plaintiff has failed to put forth any evidence in support of the second, third, fourth, or fifth elements. [DN 40-1, p. 12].

The Court agrees that Plaintiff has failed to prove a prima facie case of harassment. In her response brief, Plaintiff asserts that she was "subject to harassment both through words and actions." [DN 48, p. 35]. She references "discriminatory comments," but cites only to the affidavit she submitted in response to Defendant's summary judgment motion. *Id.* In that affidavit, she states, "While working at PACS I heard comments that insinuated that younger employees were preferred over older employees." [DN 48-1, p. 2]. She does not suggest that she heard any comments relating to *race*, however. See *Williams*, 643 F.3d 511 (noting that "only harassment *based on the plaintiff's race* may be considered" (citation omitted)). Further, she does not identify the speaker or provide any context about these comments.

Plaintiff also states that she was "subject to harassment by actions." [DN 48, p. 35]. She argues that

> Defendants harassed [Plaintiff] by terminating her without cause on March 26, 2019, by soliciting negative comments from third party partners concerning her work performance, by subjecting her to anonyms (sic) survey (sic) which had never been performed on any other employee nor was a part of normal business practices, by terminating her again on August 19, 2019, and by adding fraudulent documents to her employment file even after her termination.

*Id.*; *see also id.* at 43–44 (making same argument in context of KCRA claims). Plaintiff does not cite to any evidence to support these arguments. Nevertheless, the Court will briefly address them. First, the Court has already discussed Plaintiff's March 2019 and August 2019 terminations above. As to the other allegations, there is no evidence—and again, Plaintiff cites to no evidence—suggesting that anyone from PACS "solicit[ed] negative comments from third party partners concerning her work performance." *Id.* Though multiple DCBS and PACS employees complained about Plaintiff's workplace behavior, there is no evidence that PACS "solicited" those comments. Further, to the extent Plaintiff argues she was singled out by the anonymous survey that Bustamante requested, the Court notes that she was *not* the subject of that survey. Rather, it was a general survey about employee satisfaction in the workplace, which Bustamante requested "to get a feel of where the staff was" because Bustamante was taking over Cooley-Parker's position. [DN 52, p. 37]. The survey questions addressed, among other things, work-life balance, the availability of tools and technology, and the workload distribution. [DN 40-14]. There is simply no evidence that these surveys specifically targeted Plaintiff.

Additionally, to the extent Plaintiff seeks to argue that the alleged harassment continued *after* her August 2019 termination, thereby violating § 1981, the Court notes that Plaintiff devotes less than a single sentence to this argument. She states that "Defendants harassed [Plaintiff] by . . . adding fraudulent documents to her employment file even after her termination." [DN 48, p. 35]; *see also id.* at 44 (making same arguments in context of her KCRA claims).  This argument is wholly undeveloped and unsupported by the record. Plaintiff cites to no evidence that any documents were "fraudulent"—either in their creation or their substance— nor does she dispute their contents. To the extent Plaintiff is arguing that these documents were added to her file after her termination and are therefore somehow fraudulent, the Court finds her

argument to be unsupported by the record. In fact, Defendants cite to Wilson's sworn statements explaining that all PACS employees previously had two personnel files—one for formal documents (i.e, administrative documents and formal discipline) and one for informal documents (i.e., internal memoranda and notes). [DN 50, pp. 60–62; DN 55-6]. Thus, the memoranda outlining the various concerns about Plaintiff were kept in a separate file than her formal personnel documents. There is no evidence that any of these memoranda were fraudulently created. And with respect to the mis-dated April 9, 2019 memorandum, [DN 40-12], there is no evidence of *fraud*. Further, even without consideration of that memorandum, there is ample evidence in the record to support PACS's decisions to terminate Plaintiff.

And finally, other than mere speculation, which is insufficient to defeat a motion for summary judgment, there is no evidence that any of PACS's allegedly harassing conduct was connected in any way to Plaintiff's race. On this point, Plaintiff states that "the white staff under the age of forty not been (sic) subject to the arbitrary implementation of discipline or employment actions by Defendants, Monroe and Wilson." [DN 48, p. 35]. She provides no proof in support of this statement other than to say that Kayla Powell, who ultimately replaced Plaintiff, "admitted that she faced some of the same challenges as [Plaintiff]," but "was not disciplined at all for her involvement in the actions similar to those that [Plaintiff] was terminated for." *Id.* However, as the Court has already explained, there is no evidence that Powell received similar complaints about her relationship with DCBS or her supervisory style and workplace behavior, nor does Plaintiff cite to any such evidence.

In sum, then, the Court therefore finds that Plaintiff has failed to raise a genuine dispute of material fact with respect to the second and third elements of her harassment claim. In other words, there is no evidence from which a reasonable jury could conclude that Plaintiff was

subjected to unwelcome harassment based on her race.  In fact, most—if not all—of Plaintiff's allegations of workplace harassment are completely lacking in support, and as a result, she has failed to demonstrate the essential elements of a race-based harassment claim under § 1981. The Court will therefore grant summary judgment on behalf of Defendants to the extent Plaintiff seeks to recover under § 1981 for racial harassment/hostile workplace.

Accordingly, the Court will grant summary judgment on behalf of Defendants to the extent Plaintiff seeks to recover under § 1981 for racial discrimination, harassment, and retaliation (Count 1).

### F. Counts 2, 3, 4 – Age and Race Discrimination and Retaliation in Violation of the Kentucky Civil Rights Act

#### 1. Inapplicability of KRS § 344.050

In her complaint, Plaintiff cites to KRS § 344.050 in support of her KCRA claims. [DN  1]. Defendants argue that KRS § 344.050 does not apply to Defendants.[7] [DN 40-1, pp. 14–15]. That statute prohibits discrimination by "employment agencies," while KRS § 344.040 prohibits discrimination by employers. Plaintiff seems to concede that she intended to cite to KRS § 344.040. [DN 48, p. 38]. She argues that her intent to bring her claim under this provision was clear in her complaint, as she repeatedly stated that the statute (incorrectly cited as KRS § 344.050) "prohibits an employer" from discriminating against an individual because of that individual's race or age. The Court agrees that Plaintiff merely miscited the statute in her complaint, when clearly she intended to sue under KRS § 344.040. Further, both parties have addressed the substance of this cause of action as though it had been brought under KRS

---

[7] As the Court has already explained, these causes of action will be dismissed to the extent they seek to impose liability against Defendant Brunner. The Court therefore considers these claims as alleged against Defendant PACS.

§ 344.040. The Court will therefore consider whether Plaintiff's claims of age and race

discrimination and retaliation under KRS § 344.040 survive summary judgment.

### 2. Race Discrimination and Retaliation Under KRS § 344.040 (Count 2 and Count 4)

The KCRA makes it unlawful for an employer "[t]o fail or refuse to hire, or to discharge

any individual or otherwise to discriminate against an individual with respect to compensation,

terms, conditions or privileges of employment" based on that individual's race or age (if between

forty and seventy years old), among other things. KRS § 344.040. Because the language of the

KCRA "is nearly identical to that found in Title VII of the Civil Rights Act of 1964, Kentucky

courts have interpreted this statute consonant with Title VII." *Allen v. Ingersoll-Rand Co.*, No.

1:96-CV-6-M, 1997 WL 579140, *4 (W.D. Ky. June 17, 1997). In this case, the Court has

already undertaken a Title VII analysis with respect to Plaintiff's § 1981 claims of race-related

discrimination, retaliation, and harassment/hostile work environment and will grant summary

judgment on those claims. For the same reasons, Plaintiff's KCRA claims of race-related

discrimination, retaliation, and harassment/hostile work environment necessarily fail, to the

extent they are based on the same conduct (i.e., the March 2019 and August 2019 terminations

and the alleged harassment occurring between those terminations and after the August 2019

termination).  The Court will therefore grant summary judgment in favor of Defendants on

Counts 2 and 4 to the extent they cover the same conduct alleged in Count 1.

However, in that portion of her response brief addressing her KCRA claims, Plaintiff

adds an additional basis for her racial discrimination claim: the promotion of P'pool. [DN 38, pp.

41–42. She states that she was subject to an adverse employment action "because she was

overlooked for the promotion of Operational director (sic) and not give (sic) the opportunity to

even apply." [DN 48, pp. 41–42]. Instead, she argues, PACS hired P'pool, who was not qualified

for the position. *Id.* at 42. She further argues that she was "treated differently because after P'Pool (sic) was demoted, instead of allowing [Plaintiff] to apply for the position, PACS eliminated the position in its entirety." *Id.* In response, Defendants explain the reason for P'pool's promotion. [DN 55, p. 27]. According to Defendants, the Operational Director position was created specifically for P'pool because she, as assistant to the program director, could easily absorb some of the director's duties after he retired. *Id.*; *see also* [DN 51, pp. 56–57]. To compensate her for taking on those extra duties, PACS proposed and DCBS approved the creation of the Operational Director position. [DN 55, p. 27]. No other employees—of any race or age—were permitted to apply. *Id.*; *see also* [DN 51, pp. 56–57]. Then, upon learning that a director position required certain credentials that P'pool did not have, the position was simply eliminated and P'pool was relegated to her former title. [DN 55, p. 27]. Thus, even assuming Plaintiff has demonstrated a prima facie case of race discrimination based on P'pool's promotion, Defendants have articulated a legitimate and nondiscriminatory reason for that decision. Plaintiff fails to argue pretext, and the Court has not identified any evidence of record that would support such an argument. In fact, there is no evidence in the record suggesting that P'pool's promotion was in any way related to race (or age).

Accordingly, the Court will grant summary judgment on behalf of Defendants on Plaintiff's KCRA claims of racial discrimination (Count 2) and retaliation (Count 4).

### 3.  Age Discrimination Under KRS § 344.040 (Count 3)

As previously noted, Kentucky courts turn to Title VII when evaluating KCRA discrimination claims. *Allen*, 1997 WL 579140, *4. Additionally, when those discrimination claims are based on age rather than race, "Kentucky courts also look to the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. [hereinafter 'ADEA'], and federal cases interpreting

this act." *Id.* (citation omitted); *see also Acree v. Tyson Bearing Co.*, 128 F. App'x 419, 426 (6th Cir. 2005). "The ADEA prohibits employers from discharging employees forty years of age or older on the basis of age." *McKinley v. Skyline Chili, Inc.*, 534 F. App'x 461, 464 (6th Cir. 2013) (citing 29 U.S.C. § 623(a)). When a plaintiff seeks to prove an age discrimination claim by circumstantial evidence, as Plaintiff does, the Court must apply the burden-shifting framework of *McDonnell Douglas*. *Id.* (citation omitted). Thus, Plaintiff must first demonstrate a prima facie case of age discrimination, at which point the burden shifts to Defendants to articulate a legitimate and nondiscriminatory reason for the adverse employment actions. *Id.* (citation omitted). If Defendants do so, "the burden shifts back to the plaintiff to demonstrate the reasons given were mere pretext." *Id.* (citation omitted).

To satisfy her initial burden of proving a prima facie case of retaliation, Plaintiff must "show that 1) she was a member of the protected class, 2) she was subject to an adverse employment action, 3) she was qualified for the position, and 4) she was replaced by someone outside the protected class." *Id.* (quoting *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 410 (6th Cir. 2008)) (internal quotation marks omitted). Here, Plaintiff was over the age of forty at all relevant times, was subject to an adverse employment action (two terminations), and there is no dispute that she was qualified for the position. However, as the Court has already explained in the context of her race-related claims, Plaintiff cannot demonstrate that she was replaced by someone outside the protected class after she was terminated in March 2019, or that she was treated differently than similarly situated younger employees. Thus, she cannot prove a prima facie case of age discrimination with respect to her March 2019 termination. However, she was replaced by a younger woman under the age of forty

31

after her August 2019 termination. The Court therefore finds that Plaintiff can demonstrate a prima facie case of age discrimination with respect to her August 2019 termination.

However, even assuming that Plaintiff can demonstrate a prima facie case of age discrimination with respect to *both* terminations, the Defendants have articulated a legitimate and nondiscriminatory reason for her terminations, as the Court has already explained. The burden then shifts to Plaintiff to demonstrate pretext. However, Plaintiff relies on the same arguments to support her age discrimination claim as she did her race discrimination claim. Thus, for the reasons already stated by the Court when examining those race discrimination claims, the Court finds that Plaintiff has failed to demonstrate that Defendants' proffered nondiscriminatory reason for her termination was merely pretextual.

However, Plaintiff makes two additional arguments to support her KCRA age discrimination claim. First, she argues that the promotion of P'pool, who was allegedly under the age of forty, constitutes age discrimination. [DN 48, pp. 45–46]. However, as the Court has already explained when addressing Plaintiff's race discrimination claims, Defendants have articulated a legitimate and nondiscriminatory reason for the P'pool promotion/demotion decisions, and Plaintiff fails to argue pretext. Again, the Court notes that there is no evidence of record tying P'pool's promotion to race or age. Accordingly, to the extent Plaintiff bases her age discrimination claim on the promotion of P'pool, the Court will grant summary judgment in favor of Defendants.

Plaintiff also argues that she was subject to harassment based on her age in the period following her reinstatement in April 2019 and again following her termination in August 2019. [DN 48, pp. 46–47, 48]. These arguments are addressed above in relation to Plaintiff's claims of race-based harassment. To the extent Plaintiff now argues age-based harassment, the Court finds

that she has again failed to establish that she was subject to harassment based on her age.  As the Court has already noted, Plaintiff has submitted an affidavit in which she states, "While working at PACS I heard comments that insinuated that younger employees were preferred over older employees." [DN 48-1, p. 2]. However, she does not identify the speaker or provide any context about these comments, nor does she demonstrate that these comments were anything but an isolated incident, or even that they were in any way related to Plaintiff. *See* [DN 36, p. 54]. Based on the evidence of record, a reasonable jury could not find for Plaintiff on her age-based harassment claim.

Accordingly, the Court will grant summary judgment in favor of Defendants on Plaintiff's age discrimination claim (Count 3).

### G.  Count 5 – Wage Discrimination in Violation of KRS § 344.100

With respect to Count 5, Plaintiff's wage discrimination claim, Defendants first argue that KRS § 344.100 does not prohibit any conduct; rather, it sets forth certain practices that are *not* unlawful. The statute provides, in full:

> Notwithstanding any other provision of this chapter, it is not an unlawful practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system, or a system which measures earnings by quantity or quality of production or to employees who work in different locations, if the differences are not the result of an intention to discriminate because of race, color, religion, national origin, sex, or age forty (40) and over, or because the person is a qualified individual with a disability, nor is it an unlawful practice for an employer to give and to act upon the results of any professionally developed ability test provided that the test, its administration or action upon the results is not designed, intended, or used to discriminate because of race, color, religion, national origin, sex, or age forty (40) and over, or because the person is a qualified individual with a disability.

KRS § 344.100. Simply stated, then, this provision explains that "discrimination in wages or conditions of employment is *not* unlawful when made on a basis other than race, color, religion, national origin, sex, age, or disability." *Acree v. Tyson Bearing Co., Inc.*, 128 F. App'x 419, 428

n.12 (6th Cir. 2005) (emphasis added). However, the converse of this is that discrimination in wages *is* unlawful when made on the basis of race or age, as alleged in this case. This prohibition against race- or age-based wage discrimination is outlined in Kentucky's wages and hours laws, specifically KRS § 337.423. However, this court has considered wage discrimination claims arising under the KCRA, applying federal standards. *See Perry v. AutoZoners, LLC*, 954 F. Supp. 2d 599, 607 (W.D. Ky. 2013); *Allen*, 1997 WL 579140, at \*5. The Court will therefore consider Plaintiff's wage discrimination claim under the KCRA; however, the Court finds that Plaintiff has failed to demonstrate a prima facie case.

To establish a prima facie case of wage discrimination, Plaintiff must show that (1) PACS paid different wages to employees of different races or employees under the age of forty; (2) "for equal work performed in positions that require equal skill, effort, and responsibility"; and (3) "for work performed under similar working conditions." *Perry*, 954 F. Supp. 2d at 607 (citations omitted) (analyzing KCRA wage discrimination claim). Without citing to any authority, Plaintiff argues that there is no requirement that "the jobs must be substantially equal." [DN 48, p. 29]. This statement disregards the standard just cited by the Court, as well as established case law that states the positions must "require equal skill, effort, and responsibility" and the working conditions must be similar. *See id.* In fact, this court has previously explained that, while "equal work" does not mean the jobs mut be identical, there must at least be a "substantial equality of skill, effort, responsibility and working conditions." *Id.* (quoting *Buntin v. Breathitt Cnty. Bd. of Educ.*, 134 F.3d 796, 799 (6th Cir. 1998)). The Court will therefore apply the standard cited above.

Applying this standard, the Court finds that Plaintiff fails to cite any proof supporting her wage discrimination claim. In her response brief, she argues that she was denied the opportunity

to apply for Operational Director or Cooley-Parker's position as Assistant Director after Cooley-Parker resigned, thereby denying Plaintiff an opportunity to earn a raise. While such actions could, in theory, support a general discrimination claim (if supported by other evidence), her allegations do not support a *wage discrimination* claim. The fact that other employees might have been given an opportunity to apply for promotions does not meet the essential first element of her prima facie case—i.e, that employees of other races or under the age of forty were paid at higher rates than Plaintiff.

Further, while Plaintiff argues that Wilson was "a similarly situated and educated white woman" who was "given raises by Monroe regularly," she makes no effort to explain (or to cite any evidence to explain) how Wilson is a similarly situated employee. [DN 48, pp. 50–51]. In fact, Wilson was PACS's Human Resources Director, not a social worker or Diversion Division supervisor like Plaintiff, and Plaintiff does not cite to any evidence that their jobs required equal skill, effort, and responsibility or were in any way similar. Simply stated, Plaintiff has not demonstrated that Wilson (or any other employee) was paid at a higher rate "for equal work performed in positions that require equal skill, effort, and responsibility" and "for work performed under similar working conditions." *Perry*, 954 F. Supp. 2d at 607 (citations omitted).

Lastly, the Court notes that Plaintiff's replacement, Kayla Powell, was paid *less* than Plaintiff when Powell took over Plaintiff's position. As Defendants' exhibits demonstrate, Powell was compensated at $40,000 per year as the Diversion Division supervisor, while Plaintiff's received $41,760 per year in that position. *See* [DN 40-21]; [DN 49, p. 53]. Plaintiff's contentions to the contrary are unsupported by the record.

For the reasons set forth above, the Court finds that Plaintiff has failed to demonstrate a prima facie case of wage discrimination in violation of the KCRA. The Court will therefore grant summary judgment in favor of PACS with respect to this claim (Count 5).

### H.  Count 6 – Common Law Negligent Infliction of Emotional Distress

Defendants make several arguments with respect to Plaintiff's negligent infliction of emotional distress claim, including (1) it is barred by the Kentucky Workers' Compensation Act ("KWCA") and (2) regardless, Plaintiff's claim fails because she has failed to identify an expert testimony or opinion that she suffered a severe emotional injury. [DN 40-1, pp. 22—24]. In response, Plaintiff argues that "several of PACS bad acts specific (sic) occurred after [Plaintiff] was separated from employment with PACS," and therefore, the KWCA does not apply. [DN 48, pp. 51–52]. Plaintiff does not address Defendants' arguments regarding the severity of her alleged emotional injury.[8]

The Court agrees with Defendant that this matter is barred by the KWCA's exclusivity provision. The KWCA's "comp bar precludes claims arising under a theory of negligence." *Boggs v. Appalachian Regional Healthcare, Inc.*, No. 7:20-CV-151-REW, 2021 WL 5413801, *4 (E.D. Ky. July 16, 2021) A claim for negligent infliction of emotional distress "first requires 'the recognized elements of a common law negligence claim.'" *Id.* (quoting *Osborne v. Keeley*, 399 S.W.3d 1, 17 (Ky. 2012)). In other words, a negligent infliction of emotional distress claims arises under a theory of negligence, and is therefore barred by the KWCA, so long as the employer has a policy of workers' compensation insurance. *Id.* In this case, Defendants have

---

[8] In the section of her response brief addressing her intentional infliction of emotional distress claim, Plaintiff states that "[t]he resulting mental and emotional distress has cause (sic) [Plaintiff] physical ailment, which is sever and thoroughly documented." [DN 48, p. 53]. However, she does not cite to any evidence in support of this claim, despite her position that her severe injury is "thoroughly documented," and she does not address the severity of her emotional injury.

presented evidence that PACS secured the insurance as required by the KWCA. [DN 40-23].

Plaintiff is therefore foreclosed from bringing a negligent infliction of emotional distress claim.

Further, this claim is also preempted by the KCRA. "The KCRA acts to preempt other

employment claims based in the same facts." *Boggs*, 2021 WL 5413801, at *5. Thus, this Court

has held that claims for negligent infliction of emotional distress are preempted by the KCRA

when those claims "are based on the same allegedly discriminatory conduct as [the plaintiff's]

claims under the [KCRA]." *Willis v. CMM of Indiana, LLC*, No. 07-548-C, 2008 WL 2548803,

*2 (W.D. Ky. June 23, 2008) (citations omitted). Here, Plaintiff's negligent infliction of

emotional distress claim is based in the same facts that form the basis for her KCRA claims, and

her negligent infliction of emotional distress claim is therefore "subsumed by her [KCRA] claim,

and she is limited to the remedy provided by the KCRA." *Id.* (citation omitted).

The Court notes, however, that even if this claim were not barred by the KWCA and

KCRA, it still fails to survive summary judgment because Plaintiff has failed to provide any

proof of a severe emotional injury. This Court has previously explained this requirement:

> In Kentucky, negligent infliction of emotional distress is analyzed in accordance
> with common law negligence, requiring proof of duty, breach, causation, and
> damage. See *Osborne v. Keeney*, 399 S.W.3d 1, 17 (Ky. 2012). Further, a plaintiff's
> emotional distress "must be severe or serious," meaning that "a reasonable person,
> normally constituted, would not be expected to endure the mental stress engendered
> by the circumstances of the case." *Id.* at 9. And, "the plaintiff must also show, by
> 'expert medical or scientific proof,' 'severe or serious emotional injury.'" *Reed v.
> Gulf Coast Enterprises*, No. 3:15-CV-00295-JHM, 2016 WL 79998, at *15 (W.D.
> Ky. Jan. 6, 2016) (quoting *Osborne*, 399 S.W.3d at 17–18). "A failure to establish
> any of these elements is fatal to the claim." Id. (citing *Blust v. Berea Coll.*, 431 F.
> Supp. 2d 703, 704 (E.D. Ky. 2006)); *see M & T Chems. Inc. v. Westrick*, 525
> S.W.2d 740, 741 (Ky. 1974).

*Hume v. Quickway Transportation, Inc.*, 3:16-cv-00078-JHM, 2016 WL 3349334, *11 (W.D.

Ky. June 15, 2016).

As noted above, Plaintiff does not address this issue in her response brief. She does not cite to any expert medical or scientific proof to support this essential element of her claim. And while she attaches a note from Dr. Bunyan S. Dudley of Tennessee Oncology, [DN 48-10], to her response brief, that note states only, "It is my professional opinion that excess stress (distress) contributed to this patients (sic) illness and that she should take measures to ameliorate distress in the future." *Id.* The note does not explain what "excess stress (distress)" the doctor is referring to, and it provides no other information that would tie such stress to the current claims against PACS and Brunner. *Id.* There is no deposition testimony from Dr. Dudley or any other medical or scientific proof in the record. The Court therefore finds that Plaintiff has failed to demonstrate severe or serious emotional injury. The failure to establish this element is fatal to her claim. Accordingly, the Court will grant summary judgment in favor of Defendants with respect to Plaintiff's negligent infliction of emotional distress claim (Count 6).

### I.   Count 7 – Common Law Intentional Infliction of Emotional Distress

"Kentucky courts have consistently held that where a plaintiff pursues relief under the Kentucky Civil Rights Act, a claim of [intentional infliction of emotional distress] based on the same employer conduct is barred." *Boggs*, 2021 WL 5413801, *5 (quoting *Bogle v. Luvata Franklin, Inc.*, 2013 WL 1310753, *2 (W.D. Ky. 2013)) (internal quotation marks omitted). Here, Plaintiff's intentional infliction of emotional distress claim is predicated on the same factual allegations that form the basis of her KCRA claims. Accordingly, her intentional infliction of emotional distress claim is preempted, and the Court will grant summary judgment to Defendants on this claim (Count 7).

### J.   Count 8 – Common Law Negligent Hiring, Retention, and Supervision

Like Plaintiff's negligent infliction of emotional distress claim, her negligent hiring, retention, and supervision claim is barred by the KWCA. As previously noted, the KWCA "precludes claims arising under a theory of negligence." *Id.* at \*4.  A claim for negligent hiring, retention, and supervision "is, essentially, a claim based upon the negligence of the employer in its employment decisions." *Id.* (citation omitted). As a result, Plaintiff is foreclosed from brining a negligent hiring, retention, and supervision claim, and the Court will grant summary judgment in favor of Defendants on this claim (Count 8).

### K.  Count 9 – Common Law Wrongful Termination

"Under Kentucky law, an employee has a cause of action for wrongful termination where the termination is contrary to a fundamental and well-defined public policy as evidenced by a constitutional or statutory provision." *Campbell v. Cracker Barrel Old Country Store, Inc.*, No. 3:18-cv-386-DJH, 2020 WL 9396617, \*3 (W.D. Ky. Mar. 9, 2020) (citing *Grzyb v. Evans*, 700 S.W.2d 399, 401 (Ky. 1985)). However, "where a statute provides 'the necessary underpinning' for a wrongful discharge suit, '[t]he statute not only creates the public policy but preempts the field of its application.'" *Id.* (quoting *Grzyb*, 700 S.W.2d at 401). Accordingly, "[w]here the statute both declares the unlawful act and specifies the civil remedy available to the aggrieved party, the aggrieved party is limited to the remedy provided by the statute.'" *Id.* (quoting *Grzyb*, 700 S.W.2d at 401); *see also Broadway v. Sypris Techs., Inc.*, No. 3:09-CV-976, 2011 WL 847064, at \*4 (W.D. Ky. Mar. 9, 2011); *Barber v. Humana*, Civ. A. 3:10-CV25-H, 2010 WL 2106659, at \*3 (W.D. K.y. May 24, 2010); *Shajee v. FedEx Express*, No. 3:05-cv-211-H, 2007 WL 61850, at \*4 (W.D. Ky. Jan. 3, 2007).

In this case, Plaintiff asserts a claim for wrongful termination in violation of public policy. [DN 1, pp. 22–23]. However, the basis for this claim is the same as that for her KCRA

claims. As a result, this common law wrongful termination claim is preempted and subsumed by the more specific law, the KCRA. *See Campbell*, 2020 WL 9396617, at *3; *Watts v. Lyon Cnty. Ambulance Serv.*, 23 F. Supp. 3d 792, 813 (W.D. Ky. 2014) (citations omitted). The Court will therefore grant summary judgment in favor of Defendants with respect to this claim (Count 9).

### L.  Count 10 – Whistleblower Retaliation in Violation of KRS § 61.102

Defendants first argue that the Court lacks jurisdiction to hear this claim. For support, Defendants cite to case law in which the Sixth Circuit explained,

> "[S]tate governments and entities that can be considered arms of the state are immune from suits for money damages under the Eleventh Amendment." [*Rodgers v. Banks*, 344 F.3d 587, 594 (6th Cir. 2003)] (internal quotation marks omitted). One exception to this rule is waiver; that is, "if a State waives its immunity and consents to suit in federal court, the Eleventh Amendment does not bar the action." *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 238, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985) (abrogated on other grounds). "[I]n order for a state statute or constitutional provision to constitute a waiver of Eleventh Amendment immunity, it must specify the State's intention to subject itself to suit in *federal court.*" *Rose v. Stephens*, 291 F.3d 917, 925 (6th Cir.  2002) (internal  quotation marks omitted). We have found that the language of the Kentucky Whistleblower Act, "which specifically waives Kentucky's sovereign immunity only in its own courts, is insufficient to waive the state's immunity from suit in federal court." *Id.* Alternatively, a state may waive its Eleventh Amendment immunity by consenting to the suit. *Lawson v. Shelby Cnty., Tennessee*, 211 F.3d 331, 334 (6th Cir.2000). "Consent may . . . take the form of a voluntary appearance and defense on the merits in federal court." *Id.*

*Akers v. County of Bell*, 498 F. App'x 483, 489 (6th Cir. 2012). Thus, Defendants are actually arguing that PACS, as a state agency, is entitled to sovereign immunity with respect to Plaintiff's whistleblower claim. In response, Plaintiff urges the Court to assume jurisdiction, arguing that it would be in the interest of judicial efficiency. [DN 48, p. 56]. Plaintiff cites to no case law or authority to support her contention that the Court may disregard sovereign immunity in the name of judicial economy.

The Court agrees that Defendant PACS[9] is entitled to sovereign immunity in this Court for the reasons cited above in *Akers*. PACS only argued the merits of this claim as an alternative argument, in the event the Court found it had jurisdiction, and therefore did not waive its claim to sovereign immunity. Accordingly, the Court will grant summary judgment in favor of Defendant PACS with respect to Plaintiff's claim of whistleblower retaliation (Count 10).

### M. Count 11 – Age and Race Discrimination in Violation of Title VII

Plaintiff's Title VII discrimination claim parallels her § 1981 and KCRA discrimination claims. As previously noted, federal courts look to federal law under Title VII when construing a similar KCRA claim, and § 1981 claims are also evaluated under the same standard as Title VII. Thus, this Court must analyze Plaintiff's Title VII claims under the same framework that it previously employed when considering her § 1981 and KCRA claims. For the same reasons that Defendants are entitled to summary judgment on the § 1981 claims and the KCRA claims, they are likewise entitled to summary judgment on Plaintiff's Title VII claim (Count 11). *See Watts*, 23 F. Supp. 3d at 808.

### N.  Defendants "Does 1–50"

Upon granting summary judgment in favor of Defendants PACS and Brunner, the only remaining defendants will be "Does 1–50." However, Plaintiff did not move to substitute named parties in place of these defendants prior to the expiration of the statute of limitations. In fact, the Court previously denied Plaintiff's attempts to amend her complaint and add additional defendants, noting that amendment would be futile and the statute of limitations had expired with respect to several of her claims, including Counts 1, 6, 8, and 9 of the current complaint. [DN 38]. The Court also noted that such a late-filed amended complaint would substantially prejudice

---

[9] As the Court has already explained, Defendant Brunner cannot be held liable in his individual capacity under the Kentucky Whistleblower Act. Plaintiff concedes this point. [DN 48, p. 55].

the defendants. *Id.* Because at this late stage of the proceedings, Plaintiff cannot amend her complaint to add named defendants in place of "Does 1–50," those defendants must also be dismissed. *See Smith v. City of Akron*, 476 F. App'x 67, 69 (6th Cir. 2012).

## IV.   CONCLUSION

For the reasons set forth above, **IT IS ORDERED** that the Motion for Summary Judgment filed by Defendants Roy Brunner and Pennryile Allied Community Services, [**DN 40**], is **GRANTED**. A separate judgment shall follow.

**Thomas B. Russell, Senior Judge**
**United States District Court**

April 1, 2022

cc: Counsel of Record